IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CARE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KIRSTJEN M. NIELSEN, | : | CIVIL ACTION NO. |
| SECRETARY, U.S. DEPT. OF | : | 1:18-CV-04666-AT |
| HOMELAND SECURITY, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## OPINION AND ORDER

### I.    Introduction

This matter is before the Court on cross-motions for summary judgment. For the reasons set forth below, the Court **GRANTS in part and DENIES in part** Plaintiff's Motion for Summary Judgment [Doc. 18], **DENIES** the Defendants' Cross-Motion for Summary Judgment [Doc. 21], and **REMANDS** this matter to the Defendants for re-consideration consistent with the provisions of this Order and Opinion.

### II.   The Parties, Background, and Procedural History

Plaintiff, Cooperative for Assistance and Relief Everywhere, Inc. ("CARE" or "Plaintiff"), is a non-profit organization that provides emergency aid and development assistance to underdeveloped or emerging countries. (Doc. 1 at 9.) Plaintiff hired Ms. Aurelie Ngo Mambongo (the "Beneficiary") for the position of

Impact Data Analyst. (Doc. 26-1 at 48.) Plaintiff alleges that the Secretary of the Department of Homeland Security, the Director of the United States Citizenship and Immigration Services ("USCIS"), and the Director of the USCIS California Service Center (collectively, the "Defendants"), acted arbitrarily and capriciously when they denied an H-1B visa on the grounds that the position the Plaintiff sought to fill was not a specialty occupation. The relevant facts come from the Administrative Record on which Defendants relied for their decision-making.

On January 22, 2018, Plaintiff filed a Form I-129 Petition seeking an H-1B visa designation for the Beneficiary. (*See* Mar. 29, 2018 Denial, Doc. 26-1 at 91.[1]) On January 31, 2018, Defendants issued a Request for Evidence ("RFE") seeking additional information about the position. (Jan. 31, 2018 RFE, Doc. 28-1.) In the RFE, Defendants informed Plaintiff that the position did not appear to be a "specialty occupation" as required for issuance of an H-1B visa. (Doc. 28-1 at 3.) Plaintiff responded to the RFE by submitting a Position Description Letter from Korinne Chiu, Ph.D. Acting Director, Multiplying Impact at CARE (Chiu Letter, Doc. 26-1 at 171–74), and a letter from Robert J. Vandenberg, Ph.D., Professor of Business and Head of the Department of Management at the University of Georgia. (Vandenberg Letter, Doc. 26-1 at 222–27.)

On March 29, 2018, USCIS denied the petition, stating that the submitted materials did not substantiate Plaintiff's position that "Impact Data Analyst"

---

[1] The Court derives its factual findings from the Administrative Record, filed on the docket at Doc. 26, Doc. 26-1, Doc. 26-2 and Doc. 28. Citations to the Administrative Record therefore reflect the docket item and page number assigned by the CM/ECF system.

meets the requirements to classify it as a "specialty occupation." (Mar. 29, 2018 Denial, Doc. 26-1 at 91–98; *see also* Jan. 31, 2018 RFE, Doc. 28-1 at 3–6.) The denial stated that Dr. Vandenberg's conclusion "shows that the proffered position is not a specialty occupation because it does not require a degree in a specific, specialized field." (Doc. 26-1 at 97.)

On May 7, 2018 Plaintiff filed a second Form I-129 Petition. (Doc. 26–1 at 33.) Along with the form, Plaintiff submitted: a letter in support of the petition from Myron Kramer of Kramer Partners LLP, outside counsel for CARE (Doc. 26–1 at 48–51); six previously approved similar H-1B visa applications for positions at CARE (Doc. 26–1 at 63–68, 319–24, 329–35); a letter of support from Plaintiff's in-house counsel, Scott M. Lenhart (Doc. 26–2 at 55–58); a copy of the first denial (Doc. 26–1 at 91–98); the certified Labor Conditions Application (Doc. 26-2 at 72–77); an expert opinion letter by Professor David Goldsman, Ph.D., from the Georgia Institute of Technology's H. Milton Stewart School of Industrial & Systems Engineering, specializing in the field of Operations Research (Doc. 26-1 at 57–62); a CARE Annual Report (Doc. 26-1 at 255–75); an Occupational Outlook Handbook disclaimer (Doc. 26-1 at 163); and the Beneficiary's prior visas (Doc. 26-1 at 75–89).[2]

On May 17, 2018, Defendants issued an RFE in response to Plaintiff's second petition, informing the Plaintiff that the petition did not support a finding

---

[2] The petition also included a letter from the Emory Clinic describing the health condition of the Beneficiary (Doc 26-1 at 89) and select cases from the Administrative Appeals Office (Doc. 26-1 at 236–56).

that the position requires a degree in a specific specialty or that the duties are so specialized and complex to qualify as a "specialty occupation." (May 17, 2018 RFE, Doc. 26–1 at 344.) Plaintiff responded on June 22, 2018 with a second letter from Dr. Goldsman (Doc. 26–2 at 18–22) and a second letter in support from Mr. Kramer. (Doc. 26–2 at 12–16.) Mr. Kramer's letter focuses on the language of the regulations that set the standards for a specialty occupation. (Doc. 26-2 at 12—16.) Mr. Kramer stated, "the fact that one can enter into the position holding one of a certain number of related and relevant technical, analytical degrees should not be a bar to a finding that the position is a specialty occupation[.]" (Doc. 26-2 at 13.)

On July 3, 2018, Defendants denied the second H-1B petition on the basis that Plaintiff failed to provide sufficient evidence to show that the position was a specialty occupation. (July 3, 2018 Denial, Doc. 26-1 at 5–12.) There are substantial similarities in both of the denial letters' reasoning as to why the petition was not approved. (*Compare* July 3, 2018 Denial, Doc. 26-1 at 5—12; *with* Mar. 29, 2018 Denial, Doc. 26-1 at 91—98.)

Plaintiff filed the instant Complaint on October 5, 2018 and Defendants filed an answer on December 12, 2018. (Complaint, Doc. 1; Answer, Doc. 13.) Plaintiff filed a Motion for Summary Judgment on August 16, 2019 (Doc. 18) and Defendants filed a cross-Motion for Summary Judgment that also served as a Response to Plaintiff's Motion for Summary Judgment on September 13, 2019. (Doc. 21.) Plaintiff filed a Reply in support of their own Motion that also served as

a Response to Defendant's Motion for Summary Judgment on October 4, 2019. (Doc. 23.) Defendants filed a Reply in support of their Motion on October 25, 2019. (Doc. 24.) The Administrative Record was filed on February 6, 2020 (Doc. 26) with a supplemental filing on February 17, 2020. (Doc. 28.)

## III.   Background and Facts

H-1B visas are non-immigrant visas for temporary workers who come to the United States "to perform services in a specialty occupation[.]" 8 C.F.R. § 214.2 (h)(1)(ii)(B)(1).[3] The petitioner for an H-1B visa – the employer – has the burden of proving that the job is a "specialty occupation" as defined by the statute. *See Royal Siam Corp. v. Chertoff*, 484 F.3d 139, 144 (1st Cir. 2000). Title 8 of the United States Code lists the requirements for a "specialty occupation" this way:

> (1) Except as provided in paragraph (3), for purposes of section 1101(a)(15)(H)(i)(b) of this title, section 1101(a)(15)(E)(iii) of this title, and paragraph (2), the term "specialty occupation" means an occupation that requires—
>
> > (A) theoretical and practical application of a body of highly specialized knowledge, and
> >
> > (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.

---

[3] H-1B visas are also available to temporary workers who provide "services relating to a Department of Defense cooperative research and development project or coproduction project, or services as a fashion model who is of distinguished merit and ability[.]" 8 C.F.R. § 214.2(h)(1)(i).

8 U.S.C. § 1184(i)(1). Title 8 of the Code of Federal Regulations further defines a specialty occupation as:

> An occupation which requires theoretical and practical application of a body of highly specialized knowledge in fields of human endeavor including, but not limited to, architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts, and which requires the attainment of a bachelor's degree or higher in a specific specialty, or its equivalent, as a minimum for entry into the occupation in the United States.

8 C.F.R. §214.2(h)(4)(ii). Pursuant to that same section of the Code of Federal Regulations, any one of the following four criteria must be met for a position to qualify as a specialty occupation:

> (1)   A baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular position;
>
> (2)   The degree requirement is common to the industry in parallel positions among similar organizations or, in the alternative, an employer may show that its particular position is so complex or unique that it can be performed only by an individual with a degree;
>
> (3)   The employer normally requires a degree or its equivalent for the position; or
>
> (4)   The nature of the specific duties are so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree.

8 C.F.R. §214.2(h)(4)(iii)(A); *see also Royal Siam Corp. v. Chertoff*, 484 F.3d 139, 145 (1st Cir. 2007) ("To satisfy [8 C.F.R. §214.2(h)(4)(ii)], a position must touch at least one of four overlapping bases.").

When filing an H-1B petition, petitioners must submit a Labor Condition Application ("LCA"). *See* 8 U.S.C.A. § 1182(n) "Labor Condition Application" (West); *and Cyberworld Enter. Techs., Inc. v. Napolitano*, 602 F.3d 189, 192 (3d Cir. 2010) (citing Pub. L. No. 101–649 § 205, 104 Stat. 4978, 5021–22 (1990); Pub. L. No. 105–277 § § 412–13, 112 Stat. 2681, 2981–642 to –650 (1998)). The LCA is a document prepared by the petitioner in which the petitioner makes several attestations, including that

> (A) The employer—
>
> > (i) is offering and will offer … wages that are at least—
> >
> > > (I) the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question, or
> > >
> > > (II) the prevailing wage level for the occupational classification in the area of employment, whichever is greater, based on the best information available as of the time of filing the application, and
> >
> > (ii) will provide working conditions for such a nonimmigrant that will not adversely affect the working conditions of workers similarly employed.
>
> (B) There is not a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment.

(C) The employer, at the time of filing the application—

(i) has provided notice of the filing under this paragraph to the bargaining representative (if any) of the employer's employees ..., or

(ii) if there is no such bargaining representative, has posted notice of filing in conspicuous locations at the place of employment.

(D) The application shall contain a specification of the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed.

8 U.S.C. § 1182(n)(1); *see also Cyberworld Enter. Techs., Inc. v. Napolitano*, 602 F.3d 189, 192 (3d Cir. 2010)*; Nat'l Ass'n of Mfrs. v. U.S. Dep't of Labor*, No. CIV. A. 95-0715, 1996 WL 420868, at *3–4 (D.D.C. July 22, 1996). The "occupational classification" referred to in section (D) of 8 U.S.C. § 1182(n)(1) is the "Standard Occupational Classification" system used to classify workers into occupational categories which is issued by the U.S. Department of Labor. *See* Standard Occupational Classification, U.S. Bureau of Labor Statistics, https://www.bls.gov/soc/.[4] The Occupational Outlook Handbook ("OOH") displays details such as wage, education and training requirements, and job outlook, for hundreds of occupations. *See* The Occupational Outlook Handbook

---

[4] The U.S. Department of Labor also maintains a more detailed occupational database for use by federal agencies, the Occupational Information Network database ("OIN" or "O*NET") that is built on the same and related data used in the OOH, as referenced in the expert statement from Dr. Vandenberg and the letter from counsel Myron Kramer on behalf of CARE later discussed herein. See O*NET Resource Center, O*NET OnLine. https://www.onetcenter.org/overview.html.

Summary,       U.S.       Bureau       of       Labor       Statistics,
https://www.bls.gov/news.release/ooh.nr0.htm; *and* Doc. 26-1 at 7; *cf. also*
*Innova Sols., Inc. v. Baran*, 399 F. Supp. 3d 1004, 1012 (N.D. Cal. 2019)
("…USCIS looks to the OOH as the authoritative source on the duties and
educational requirements of a wide variety of occupations.").

In this case, although CARE sought to hire for a position called Impact
Data Analyst, there is no listing for that particular position title in the OOH so
CARE identified the "Operations Research Analyst" listed by the OOH as a rough
analogue to CARE's Impact Data Analyst's position. Defendants therefore
evaluated whether the position met the specialty occupation criteria by looking to
the OOH entry for "Operations Research Analyst" and the LCA, as well as the
expert opinions provided by Plaintiff. *Cf. Fast Gear Distrib., Inc. v. Rodriguez*,
116 F. Supp. 3d 839, 849 (E.D. Mich. 2015) ("[I]t is incumbent upon USCIS to
carefully evaluate each visa petition to ensure that the offered position truly
meets the requirements of the "specialty occupation" classification.").

The OOH describes the qualifications for an Operations Research Analyst
as follows:

> Although the typical educational requirement for entry-
> level positions is a bachelor's degree, some employers
> may prefer to hire applicants with a master's degree.
> Because few schools offer bachelor's and advanced
> degree programs in operations research, analysts
> typically have degrees in other related fields. . .
> Although some schools offer bachelor's and advanced
> degree programs in operations research, some analysts
> have degrees in other technical or quantitative fields,

> such as engineering, computer science, analytics, or mathematics.
>
> Because operations research is based on quantitative analysis, students need extensive coursework in mathematics. . . Courses in other areas, such as engineering, economics, and political science, are useful because operations research is a multidisciplinary field with a wide variety of applications.

(OOH, Doc. 26–2 at 210.)

Dr. Chiu's letter, submitted with the first petition, explained that as Acting Director of Multiplying Impact at CARE, she created the Impact Data Analyst position as one role in a newly established "team devoted to impact measurement." (Chiu Letter, Doc. 26-1 at 173.) According to Dr. Chiu, CARE required "someone with a degree in a technical or quantitative field, with documented course work in fields including a large component in analytics," because the specific duties of the position "require[] a strong basis in analysis, statistics, mathematics and computer science." (Doc. 26-1 at 171–73.) Dr. Chiu further explained that CARE relies heavily on analytics for its decision making. (Doc. 26-1 at 171.) The Impact Data Analyst position was designed to "support[] data collection, aggregation, cleaning, validation, visualization, and use for impact measurement data including, but not limited to reach and impact data collected through CARE International's Project and Program Impact Information Reporting System (PIIRS) as well as project, program, regional, and global-level analysis of data upon request of teams and colleagues." (Doc. 26-1 at 173.) Dr. Chiu stated that the position "entails special unique characteristics, due in part to

the special nature of [CARE's] operations on a global basis." (Doc. 26-1 at 173.) Dr. Chiu emphasized the need for "familiarity with the types of data CARE collects, the formats of the data, and how they can be restructured to perform critical analyses." (Doc. 26-1 at 173–74.)

Dr. Vandenberg, Professor of Business and the Head of the Department of Management at the University of Georgia, provided an opinion letter in which he addressed first his own qualifications for offering an expert opinion, including that he is a tenured professor who has performed more than "350 expert opinions every year since 2000 for the purpose of submission to the [USCIS]," and that he has over 36 years of experience in "Management, Information Systems, HR Management and other Business Administration Areas."  (Vandenberg Letter, Doc. 26-1 at 222—23.) Dr. Vandenberg next described the "Impact Data Analyst job duties as compared to the Operations Research Analyst description in the [OOH]." (Doc 26-1 at 223—26.) In this section, Dr. Vandenberg explains that, because CARE's work involves "operationalizing [its] mission within 94 vastly different countries with over 80 million people[,]" CARE needs to be able to collect and process data in a way that is relatively unique. (Doc. 26-1 at 223—24.) Dr. Vandenberg explains that CARE is "extremely dependent" on hiring an individual who can "make sense" of a huge array of non-standardized data, while taking into account a variety of "different cultural norms, religious beliefs, and political structures." (Doc. 26-1 at 224.) The individual that CARE must hire, according to Dr. Vandenberg,

> [H]as to have received formal education not only in the
> basic business functions such as finance, operations
> management, accounting, economics, management
> information systems, and strategy/policy, but also
> advanced education [in] data analytics, economic policy,
> policy data analysis, econometrics and advanced
> statistics, micro- and macro-economic analysis, and a
> host of other topics.

(Doc. 26-1 at 224.)[5] He went on to say that the position at CARE is similar to positions at the Central Intelligence Agency where an analyst "does not have a single standardized data source, but gathers data from a myriad of sources" in order to assist policy makers in "mak[ing] sense" of "what is going on in one country or region [versus] others." (Doc 26-1 at 224.) Dr. Vandenberg then proceeds in his letter to explain in detail how the various responsibilities of the Impact Data Analyst position – including data analysis and management, data visualization, capacity building for data use, knowledge sharing, and performing other impact measurement and global "MEI" duties as needed – are similar to the tasks included in the description of the "Operations Research Analyst" position in the OOH. (Doc. 26-1 at 225.)

Dr. Vandenberg states that the "majority of the positions in this occupational category [Operations Research Analyst] require graduate school . . . . While requirements for entry into this position vary by employer as to what

---

[5] Although not directly material to the Court's consideration of this matter, Dr. Vandenberg also concluded that the Beneficiary "is uniquely qualified for CARE's Data Impact Analyst position and will be able to apply [her] education to 'make sense' out of the disparate sources of data. That is, she can use those data analytic tools to help other[s] visualize the meaning of the various data sources, and in doing so, facilitate the decisions of the chief policy makers as they formulate how one set of programs may need to be changed to be successful in other countries." (Doc. 26-1 at 224.)

course of study might be appropriate, it is clear that the course of study . . . . includes, per the OOH description, degrees in other technical or quantitative fields, such as engineering, computer science, analytics, or mathematics." (Doc. 26-1 at 226.) He then concludes that the duties of the CARE Impact Data Analyst "are so complex that they require the performance of a professional with at least a Master's degree in business administration or closely-related discipline such as economics, economics policy, and policy planning."  (Doc. 26-1 at 227.) Dr. Vandenberg's letter explains at length how the requisite educational background and training for the CARE Impact Data analyst position is fully consistent with the requirements of the OOH Operations Research Analyst job description's specified qualifications. Thus, he addresses how a highly technically focused academic degree program in economics,  business, engineering or public policy academic program, would be structured to provide training and coursework in quantitative data analysis, statistics, microeconomics, finance, and applied research techniques and would provide the required foundation for both the CARE Impact Data Analyst and OOH Operations Research Analyst positions.

In USCIS's March 29, 2018 denial of the first petition, USCIS stated that the submitted materials did not substantiate Plaintiff's position that the Impact Data Analyst meets the requirements to classify it as a "specialty occupation." (Doc. 26-1 at 91–8; *see also* RFE, Doc. 28-1 at 3–6.)  The denial noted that Dr. Vandenberg's conclusion "shows that the proffered position is not a specialty

occupation because it does not require a degree in a specific, specialized field."
(Doc. 26-1 at 97.)

Plaintiff filed a second Form I-129 Petition on May 7, 2018 (Doc. 26–1 at
33), along with several pieces of supporting material, listed above, including a
letter from Dr. Goldsman, Professor at the Georgia Institute of Technology's H.
Milton Stewart School of Industrial and Systems Engineering. Before writing his
letter in support of the second petition, Dr. Goldsman spoke at length with Dr.
Chiu and the Beneficiary individually to discuss the nature and duties of the
Impact Data Analyst position and its function within CARE. (Goldsman Letter,
Doc. 26-1 at 58.)  For unknown reasons, USCIS's decision letters wholly ignored
this and other evidence in finding that Dr. Goldsman relied solely on a job
description in reaching his findings. In his first letter, Dr. Goldsman explained
the field of Operations Research and what an Operations Research Analyst's
duties entail on a day-to-day basis. (Doc. 26-1 at 58–59.) According to Dr.
Goldsman, Operations Research is a "multidisciplinary field that combines
methodological techniques derived from Mathematics, Statistics, Engineering,
Computer Science, Economics, Management, and Public Policy departments."
(Doc. 26-1 at 58.) Dr. Goldsman described Operations Research as a "rigorous
field that requires a great deal of coursework." (Doc. 26-1 at 59.) Most
universities do not offer degrees in Operations Research, according to Dr.
Goldsman, so the expertise required to fulfill the duties of such a job must be
obtained "in a variety of venues." (Doc. 26-1 at 59.) Dr. Goldsman opined that the

acceptable course of study for becoming an Operations Research Analyst is "limited to a course of study that include degrees in a group of technical or quantitative fields, such as Engineering, Computer Science, Analytics, or Mathematics." (Doc. 26-1 at 61.)

After the Defendants issued an RFE in response to the second petition, Dr. Goldsman issued a second letter that echoed his original opinion, but also addressed Defendants' concern that the position allowed for an expansive set of degrees. (Doc. 26-2 at 18–21.) He explained that the previously named areas of study "are not meant to indicate that there is no standard for how one prepares for a career in Operations Research, but is meant to illustrate the linkage and commonality of a certain few disciplines which are so interconnected as to provide a basis for entry into a career in Operations Research." (Doc. 26-2 at 20.) On July 3, 2018, Defendants denied the second H-1B petition on the basis that Plaintiff failed to provide sufficient evidence to satisfy any one of the four criteria to show that the position was a specialty position. (*See* July 3, 2018 Denial, Doc. 26-1 at 5–12.)

## IV.  **Standard of Review**

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's

favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324–26.

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

The applicable standard under the Administrative Procedure Act ("APA") to review an agency's decision is whether the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Defenders of Wildlife v. U.S. Dept. of Navy*, 733 F.3d 1106, 1114–15 (11th Cir. 2013). An agency action may be found arbitrary and capricious:

> where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Miccosukee Tribe of Indians of Florida v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009) (quoting *Alabama–Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007)). "The arbitrary and capricious standard is 'exceedingly deferential.'" *Defenders of Wildlife*, 733 F.3d at 1115 (citing *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996)). Reasoned decision-making under the Administrative Procedure Act calls for an explanation for agency action. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

> To determine whether an agency decision was arbitrary and capricious, the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must be 'searching and careful,' but 'the ultimate standard of review is a narrow one.' Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the least latitude in finding grounds for reversal; '[a]dministrative decisions should be set aside in this context ... only for substantial procedural or substantive

> reasons as mandated by statute, ... not simply because
> the court is unhappy with the result reached.' The
> agency must use its best judgment in balancing the
> substantive issues. The reviewing court is not authorized
> to substitute its judgment for that of the agency
> concerning the wisdom or prudence of the proposed
> action.

*Fund for Animals*, 85 F.3d at 541–42 (quoting *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538–40 (11th Cir. 1990) (footnotes and citations omitted)).

In determining whether the agency acted arbitrarily and capriciously, the Court must ask whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1288 (11th Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court is not authorized to substitute its judgment for the agency's as long as the agency's conclusions are rational. *Defenders of Wildlife*, 733 F.3d at 1115 (citing *Miccosukee Tribe of Indians*, 566 F.3d at 1264); *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008); *Pres. Endangered Areas of Cobb's History, Inc. ("PEACH") v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996) ("The court's role is to ensure that the agency came to a rational conclusion, 'not to conduct its own investigation and substitute its own judgment for the administrative agency's decision.'")). While the Court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned ... [it] may not supply a reasoned basis for the

agency's action that the agency itself has not given." *Black Warrior Riverkeeper*, 781 F.3d at 1288 (internal citations omitted).

The Court "also reviews the findings of fact under the 'substantial evidence test' which requires the Court to "'view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision.'" *Perez-Zenteno v. U.S. Attorney Gen.*, 913 F.3d 1301, 1306 (11th Cir. 2019) (quoting *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc)). Accordingly, the Court must affirm the agency's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Perez-Zenteno v. U.S. Attorney Gen.*, 913 F.3d 1301, 1306 (11th Cir. 2019) (quoting *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 818 (11th Cir. 2004)) (quotation omitted). Substantial evidence is defined as more than a mere scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "To reverse the … fact findings, [the Court] must find that the record not only supports reversal, but compels it." *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1287 (11th Cir. 2003). "'That is, even if the evidence could support multiple conclusions, we must affirm the agency's decision unless there is no reasonable basis for that decision.'" *Perez-Zenteno*, 913 F.3d at 1306 (quoting *Adefemi*, 386 F.3d at 1029).

Normally, "[i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing

court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). That said, a court may properly find that an agency determination is arbitrary and capricious and vacate the finding where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat. Res. Def. Council v. U.S. E.P.A.*, 658 F.3d 200, 215 (2d Cir. 2011) (*quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## V.    Discussion

Although the Eleventh Circuit has not addressed the particular legal issues in this case, other courts have done so in comparable cases. The Court found those opinions informative, albeit lacking direct precedential authority. The central issue posed in the instant case, in slightly different guises, is whether USCIS erred and acted arbitrarily and capriciously in determining that the CARE impact data analyst position  failed to meet one or more of the regulatory criteria under 8 C.F.R. §214.2(h)(4)(iii)(A) referenced for determining a "specialty occupation." The differences between the four criteria for establishing whether a position is a "specialty occupation" under 8 C.F.R. §214.2(h)(4)(iii)(A) are

nuanced at best. USCIS concluded that Plaintiff failed to meet *any* one of the four criteria.  After having given the requisite strong deference to the agency's decision making and carefully reviewing the record, the Court concludes that USCIS's decision and reasoning in reaching its findings contained fundamental errors and gaps, particularly in connection with is determination as to the criteria set forth in 8 C.F.R. §214.2(h)(4)(iii)(A)(1),(2) and (4).

The specific issues surrounding USCIS's disapproval of Plaintiff's application for a "specialty occupation" H-1B visa designation for the impact data analyst position are discussed in a number of leading district court cases.  Before the Court delves into discussion of each of the relevant criteria under 8 C.F.R. §214.2(h)(4)(iii)(A), it provides an overview here of some of the relevant district court case law addressing the types of specialized educational degree and training requirements  as well as position requirements at issue in the instant case.

In *Residential Finance Corp. v. U.S. Citizenship and Immigration Services*, USCIS denied an H-1B visa for a Market Research Analyst because "the OOH does not indicate that [the] degrees need be in a specific specialty directly related to market research." 839 F. Supp. 2d 985, 995 (S.D. Ohio 2012). The court disagreed, saying that, "[t]he record here indicates that a market and survey researcher is a distinct occupation with a specialized course of study that includes multiple specialized fields" and that "Plaintiff provided evidence that it required a baccalaureate degree for this position, and there is no apparent requirement that the specialized study needed be in a single academic discipline as opposed to a

specialized course of study in related business specialties." *Residential Finance*, 839 F. Supp. 2d at 996. The court found that the denial of the petition was arbitrary and capricious and an abuse of discretion, because USCIS "failed to examine all of the correct relevant data and to articulate an untainted, satisfactory explanation for the denial that rationally connected the facts to the decision." *Residential Finance*, 839 F. Supp. 2d at 997.

Similarly to *Residential Finance*, the district court for the Middle District of North Carolina held that the USCIS must base its denial on "a consideration of the relevant factors." *InspectionXpert Corp. v. Cuccinelli*, No. 1:19-cv-65, 2020 WL 1062821, at *27 (M.D.N.C. Mar. 5, 2020) (citing *RELX, Inc. v. Baran*, 397 F. Supp. 3d 41, 55 (D.D.C. 2019); and *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (noting that "the agency must examine the relevant data")). This consideration requires that the USCIS explains in the denial its basis for disagreeing with opinion evidence submitted to it. *Fred 26 Importers, Inc. v. U.S. Dep't of Homeland Sec.,* 445 F. Supp. 2d 1174, 1180–81 (C.D. Cal. 2006); s*ee also The Button Depot, Inc. v. U.S. Dep't of Homeland Security,* 386 F.Supp.2d 1140, 1148 (C.D. Cal. 2005) (the AAO abused its discretion when it did not indicate any basis for its conclusion that it "does not agree with the opinion evidence submitted by the petitioner."); *and Hong Kong T.V. Video v. Ilchert,* 685 F. Supp. 712, 717 (N.D. Cal. 1988) (INS abused its discretion when it disregarded the only evidence provided by the petitioner).

In *RELX, Inc. v. Baran*, the Plaintiff sought an H-1B visa designation for an employee in a "Data Analyst" position. 397 F. Supp. 3d. 41, 45–46 (D.D.C. 2019). The USCIS issued an RFE seeking more information as to whether the position was a "specialty occupation." *Id.* The Plaintiff responded to the RFE with: a supplemental letter from an "Immigration Compliance Specialist"; six job announcements from other employers for "Data Analyst" positions which required at least a bachelor's degree in a field like statistics, mathematics, economics, or operations research; and an expert opinion from a Professor of Management and Information Systems at Seattle Pacific University. *Id.* at 46–47. The USCIS then denied the petition, saying that the petitioner had failed to show the position was a specialty occupation. *Id.* at 47. But the district court found that the USCIS's rationale as stated in the denials "was both factually inaccurate and not supported by the record" as it pertained to whether a bachelor's degree or higher is normally the minimum requirement for entry to a "Data Analyst" position, and whether a requirement for a degree in one of a few related fields is enough to satisfy the specialty occupation criteria. *Id.* at 53. The district court found that the evidence in the record clearly established that the typical entry level education for the position was a bachelor's degree in one of a few closely-related fields. *Id.* at 54. The district court also found that USCIS's determination that the statute in effect requires only one type of degree to be accepted for a related position to qualify as specialized was legally and factually untenable, inconsistent with the statutory language, and arbitrary and capricious, saying:

> There is no requirement in the statute that only one type
> of degree be accepted for a position to be specialized.
> The statute and regulations simply require that a
> "position actually requires the theoretical and practical
> application of a body of highly specialized knowledge,
> and the attainment of a bachelor's or higher degree in
> the specific specialty [is a] minimum requirement for
> entry into the occupation." In other words, if the
> position requires the beneficiary to apply practical and
> theoretical specialized knowledge and a higher
> education degree it meets the requirements. Nowhere in
> the statute does it require the degree to come solely
> from one particular academic discipline. As other courts
> have explained "[d]iplomas rarely come bearing
> occupation-specific majors. What is required is an
> occupation that requires highly specialized knowledge
> and a prospective employee who has attained the
> credentialing indicating possession of that knowledge."

*RELX, Inc. v. Baran*, 397 F. Supp. 3d 41, 54–55 (D.D.C. 2019) (citations omitted); *see also Residential Fin. Corp.*, 839 F. Supp. 2d at 997 (S.D. Ohio 2012); *Tapis Int'l v. I.N.S.*, 94 F. Supp. 2d 172, 175–76 (D. Mass. 2000) (rejecting agency interpretation that would preclude any position from satisfying the specialty occupation requirements where a specific degree is not available in that field).

In contrast to the above cases, the district court in *Irish Help at Home LLC v. Melville* upheld the denial of an H-1B visa for a "deputy controller" position, finding that the position only required a person with a degree in a generic field as opposed to a course of study specialized for "deputy controller" duties. *See Irish Help,* No. 13-cv-00943, 2015 WL 848977 (N.D. Cal. Feb. 24, 2015) *aff'd*, 679 F. App'x 634 (9th Cir. 2017). But the court noted also that its decision "is not to say

that a position can only be a specialty occupation if the beneficiary has [a] specific degree in the exact field of the occupation." 2015 WL 848977 at *6–7 (citing *Tapis*, 94 F. Supp. 2d 172; and *Residential Finance*, 839 F. Supp. 2d at 997). The *Irish Help* court distinguished *Tapis* and *Residential Finance* by noting that, unlike the positions Plaintiffs sought to fill in those cases, "there is no credible evidence supporting that Irish Help's deputy controller position is specialized in the sense that ... it could only be performed by one with specialized knowledge in a specialized course of study, as opposed to one with a more generic degree." *Irish Help*, 2015 WL 848977 at *7; *cf. 3Q Digital, Inc. v. United States Citizenship & Immigration Servs.*, No. 1:19-cv-579-RCL, 2020 WL 1079068, at *3 (D.D.C. Mar. 6, 2020) (finding that USCIS erred in its determination that Plaintiff company must show that a degree in a specific field was required, as opposed to a degree in a general field or range of fields of study relevant to the qualifications required to perform the Search Engine Marketing Account Manager position at issue.)

  As discussed further below, the record in the instant case clearly establishes, at very minimum, that the CARE impact data analyst position requires a specialized course of study and training culminating in a baccalaureate and preferably master's degree, rather than just any generic college degree.

  **a. Criterion 1: A bachelor's degree or its equivalent is normally the minimum requirement for entry into the particular position.**

When read literally, the first criterion appears to be satisfied by any bachelor's degree. But when read together with 8 U.S.C. § 1184(i)(1)[6] the first criterion actually requires a bachelor's degree or its equivalent in a specific specialty. Plaintiff argues that it provided substantial evidence to illustrate that the proffered position that focuses on data analytics requires at a minimum a bachelor's degree in one of a few inter-related specific specialized areas of study – engineering, mathematics, analytics, or economics – plus particularized training or experience in technical or quantitative fields.

Defendants concluded that an Operations Research Analyst position does not meet the first criterion because the OOH's description indicates that there is no requirement for the degree to be in a specific specialty, and the job can be filled "by a variety of disciplines." (July 3, 2018 Denial, Doc. 26-1 at 8.) The OOH's description of "Operations Research Analyst" points out that "few schools offer bachelor's and advanced degree programs in operations research, [so] analysts typically have degrees in other related fields." (OOH, Doc. 26-1 at 209.) Accordingly, Plaintiff needed to show that the position required a combination of specific educational program background and experience that equaled the "equivalent" of a "specifically tailored baccalaureate program" as explained by the

---

[6]     (1) Except as provided in paragraph (3), for purposes of section 1101(a)(15)(H)(i)(b) of this title, section 1101(a)(15)(E)(iii) of this title, and paragraph (2), the term "specialty occupation" means an occupation that requires--
        (A) theoretical and practical application of a body of highly specialized knowledge, and
        (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.

court in *RELX*, *Tapis*, and other similar cases. Defendant's contention that the Operations Analyst position lacks specialization by virtue of its identification of a range of related fields that would provide the requisite technical data and analytical expertise fails for the reasons pointed out by the Court in *RELX*, as discussed earlier. "There is no requirement in the statute that only one type of degree be accepted for a position to be specialized. ... if the position requires the beneficiary to apply practical and theoretical specialized knowledge and a higher education degree it meets the requirements." *RELX, Inc. v. Baran*, 397 F. Supp. 3d at 54–55; *see also 3Q Digital, Inc.*, 2020 WL 1079068, at *3 (agreeing with the *RELX* analysis, finding that "more than one degree could qualify someone for the same position, as "[d]iplomas rarely come bearing occupation-specific majors.") (citations omitted). Similarly, in *Next Generation Technology, Inc. v. Johnson*, the District Court for the Southern District of New York reversed and remanded USCIS's decision that a "computer programmer" position did not require a bachelor's degree and application of highly specialized knowledge because the agency's finding was an arbitrary and nonsensical interpretation of the Occupational Handbook's information. 328 F. Supp. 3d 252, 265–68 (S.D.N.Y. 2017). That Court said, "this Court is at a loss to see a 'rational connection' between the evidence indicating that '*most* computer programmers have a bachelor's degree; however some employers hire workers with an associate degree' and USCIS's determination that 'computer programmers are not normally required to have a bachelor's degree.'" *Id.* at 267; *accord Info Labs Inc.*

27

*v. United States Citizenship and Immigration Services*, No. 19-cv-684, 2020 WL 1536251, at *3–6 (D.D.C.  March 31, 2020).

Both Dr. Goldsman and Dr. Vandenberg explained in their expert opinions that most universities do not offer a degree in Operations Research, consistent with the description from the OOH. (Goldsman Letter, Doc. 26-2 at 62; Vandenberg Letter, Doc. 26-1 at 225—26.) Therefore, an assessment of whether specialized coursework in a particular degree satisfies this criterion is essential. *See Tapis*, 94 F. Supp. 2d at 177; *Residential Finance*, 839 F. Supp. 2d at 996.

Dr. Chiu's Position Description Letter emphasizes that the position "requires a strong basis in analysis, statistics, mathematics and computer science" and that "courses in ancillary fields including economics are also highly relevant and important to the successful completion of the duties of the position." (Chiu Letter, Doc. 26-1 at 171–74.) Dr. Chiu's letter further makes clear that a degree is not enough for the Impact Data Analyst position, but rather, the position requires specialized coursework and training in the referenced highly-technical, closely-related areas. (Doc. 26-1 at 171—74.)

Defendants based their denial on their view that a degree in any of an "extensive list of possible degree requirements" can satisfy the requirements for the position and that this per se indicates the degree and position are not specialized. (July 3, 2018 Denial, Doc. 26-1 at 11.) But Plaintiff's submitted evidence indicates that a qualified applicant would need education in a specialized, technical field of study that includes a significant analytics

coursework component, and that the fields of engineering, computer science, analytics, and mathematics supply the necessary specialized interdisciplinary coursework foundation for performance of the duties of the CARE position. (*See, e.g.,* Goldsman Letter, Doc. 26-2 at 57–62.) In his letter, Dr. Goldsman – a renowned Professor at Georgia Institute of Technology's top-ranked Operations Research program – described the high level of rigor in Operations Research, and he identified the education necessary for CARE's Impact Data Analyst position. (Doc. 26-1 at 61 ("[T]he acceptable courses of study for becoming an operations research analyst are in fact limited to a course of study that include degrees in a group of technical or quantitative fields, such as Engineering, Computer Science, Analytics, or Mathematics.").)

In the instant case, the letters from Dr. Chiu, Dr. Vandenberg, and Dr. Goldsman lay out a specialized course of study essential for performance of the position at CARE — one that includes an emphasis in analytics, engineering, mathematics, and economics along with specialized training. (Chiu Letter, Doc. 26-1 at 171–174; Vandenberg Letter, Doc. 26-1 at 222–27; Goldsman Letters, Doc. 26-1 at 57–62, Doc. 26-2 at 18–21.) The position at CARE is distinguishable from the deputy controller in *Irish Help* because Plaintiff has shown that a generic degree would not be sufficient to equip an applicant to perform the duties of an Impact Data Analyst. (*See, e.g.*, Chiu letter, Doc. 26-1 at 171 (explaining that CARE required a candidate "with a degree in a technical or quantitative field, with documented course work in fields including a large component in analytics,"

because the specific duties of the position "require[] a strong basis in analysis, statistics, mathematics and computer science."), *see also* Goldsman Letter, Doc. 26-1 at 57–62 (describing, based on his  leading role and experience in the field of operations research analysis as well as interviews that acceptable interdisciplinary qualifications for this position can only be attained via specific advanced courses of study for degrees in a limited group of technical or quantitative fields, such as Engineering, Computer Science, Analytics, or Mathematics.).)

In the instant case, the requirement for a degree in one of four or five highly-technical courses of study that are closely-correlated to the position in question would satisfy the Criterion 1 regulation. *See RELX, Inc. v. Baran*, 397 F. Supp.3d 41 (D.D.C. 2019); *3Q Digital, Inc. v. United States Citizenship & Immigration Servs*., No. 1:19-cv-579-RCL, 2020 WL 1079068, at *3 (D.D.C. Mar. 6, 2020) ("To hold that O*NET must list one specific major for a position defies all logic, as many positions that fall under subclause 1 could be filled by people with different majors, so long as those majors are in the same general field or fields of study."); *Residential Finance*, 839 F. Supp. 2d at 995 (reversing H-1B visa denial because "market and survey researcher is a distinct occupation that includes multiple specialized fields"); *Matter of P-D-S*, 2017 WL 3485524, at *2 (AAO Dec. July 31, 2017)[7] ("In general, provided the specialties are closely related

---

[7]   While the USCIS found in *P-D-S* that the Operations Research Analyst position in that case does not constitute a specialty position for H-1B purposes, the petitioner there relied exclusively on the assertion that the position could only be performed by an individual with a minimum of a

… a minimum of a bachelor's degree in more than one specialty is recognized as satisfying the … requirement of section 214(i)(1)(B) of the Act.") (non-precedent decision)); *and* (RFE, Doc. 28-1 at 3—6; Vandenberg Letter, Doc. 26-1 at 222–27; Goldsman Letters, Doc. 26-1 at 57–62, Doc. 26-2 at 18–21.).

Accordingly, because Criterion 1 is satisfied, Petitioner need only show further that the position requires "theoretical and practical application of a body of highly specialized knowledge," in order to qualify as a specialty occupation. *See* 8 U.S.C. § 1184(i)(1). The denial letter contains virtually no analysis of the petition on this point, as discussed in the Court's Analysis below or the evidence provided by CARE discussed earlier.  But the record amply demonstrates that the CARE Impact Data Analyst required precisely this range of specialized skills, theoretical knowledge base and specialized data analytics baccalaureate degree training and skills as a foundation for execution of the analyses of impact data relating to a evaluation of CARE programs operating in 94 countries.

## b.   Criterion 2: The degree requirement is common to the industry or this particular position is so complex or unique.

Per the wording of the regulation, there are two alternative ways to satisfy the second criterion of this analysis. First, Plaintiff could show that "[t]he degree

---

bachelor's degree.  Thus, *P-D-S* is clearly a factually distinguishable case, as the petition in the instant case provides a far greater showing of proof relating to the specificity of the degree and training requirements for the Impact Data Analyst position as well as the complexity of the impact analytics of data culled from CARE programs operating throughout the world in both distinctive national and global contexts.  But to the extent that *P-D-S* may be construed as a simple rejection of the related training provided in fields such as economics and mathematics for an operations analyst position, the Court views this conclusion as not supportable in the context of the record in the instant case.

requirement is common to the industry in parallel positions among similar organizations." 8 C.F.R. §214.2(h)(4)(iii)(A)(2). Second, Plaintiff could provide evidence to demonstrate that the position "is so complex or unique that it can be performed only by an individual with a degree." *Id.*

CARE, perhaps because of the distinctive characteristics of its global non-profit organization and activity, did not provide evidence showing that the degree requirement is common to "the industry" or in parallel positions which did not previously exist within CARE.  Nor did it argue it had. Instead, CARE focused on the alternative standard.

In examining whether CARE had shown that its new Impact Data Analyst position "is so complex or unique that it can be performed only by an individual with a degree," the Agency looked to the submitted Form I-129 Petitions and supporting documentation to determine the exact position, location, wage, and description of duties. (Doc. 26-1 at 9.) In its petitions, Plaintiff provided a list of duties for the position, an explanation of the duties and specific experience requirements by Dr. Chiu, two expert opinion letters from Dr. Goldsman that discussed the specialized duties and organizational role of the position as requisite qualifications, an expert opinion letter by Dr. Vandenberg discussing the position qualifications, and the Labor Conditions Application submitted to the Department of Labor. That Application indicated that this position was classified as "Wage Level 1."

Defendants argue that the list of duties provided by Plaintiff failed to include sufficient details to meet the standard of "complex or unique." (Doc. 26-1 at 9.) The duties Defendants refer to here are listed on a previous page of the denial, and come from Dr. Chiu's letter, which summarized the "functions" of the job after a detailed discussion as:

- Data analysis and management;
- Data visualization;
- Capacity building for data use;
- Knowledge sharing.

(*See* July 3, 2018 Denial, Doc. 26-1 at 7; *see also* Chiu Letter, Doc. 26-1 at 173.) In the paragraph in her letter immediately prior to these bullet points, Dr. Chiu explains the actual duties of the position this way:

> [T]he Impact Data Analyst position…will carry out data analysis, visualization, and utilization and will provide administrative support to the Multiplying Impact/Impact Measurement Team (MI/IM) in our Programs, Partnership and Learning Department. This position supports data collection, aggregation, cleaning, validation, visualization, and use for impact measurement data including, but not limited to reach and impact data collected through CARE International's Project and Program Impact Information Reporting System (PIIRS) as well as project, program, regional, and global-level analysis of data upon request of teams and colleagues. This support includes data aggregation and restricting, cleaning, fulfillment of analysis requests, and visualization of findings through dashboards and reports. The Impact Data Analyst will also troubleshoot issues and contribute to coaching and development of training materials to support in-country capacity building for data use. The Impact Data Analyst will also provide some general support to the Multiplying Impact/Impact Measurement Team, including knowledge sharing, developing

> communication materials, and general administrative
> support.

(Doc. 26-1 at 173.) Dr. Chiu also described CARE itself as a "global leader in the movement to eradicate poverty[,]" and said that in 2016 alone, "CARE worked in 94 countries and reached 80 million people with an incredible range of life-saving programs." (Doc. 26-1 at 171, 173; *see also* CARE annual report, Doc. 26-1 at 255–75.) Defendants do not reference this portion of Dr. Chiu's letter or provide any reasoning for why this portion of her letter, describing the responsibilities and demands of the position within the context of CARE's overall work focus, fails to provide sufficient details to meet the standard of a "complex or unique" position. 8 C.F.R. §214.2(h)(4)(iii)(A)(2). Dr. Chiu also states in her letter that the position was designed to require someone with a bachelor's degree in a "relevant analytical field" because of the "complex nature of the duties of the job, and the increased reliance by CARE upon analytics in decision making[.]" (Doc. 26-1 at 171.)

Again, except for the bullet points, Defendants do not acknowledge the substance of Dr. Chiu's letter at all, and provide no analysis for how they weighed the information she provided. As such, the Court cannot fully evaluate how her letter informed Defendants' position relating to Criteria 2, nor assess whether they considered all the information before them. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575–76 (2019) (reasoned decision-making under the Administrative Procedure Act calls for an explanation for agency action); *Florida*

*Power & Light*, 470 U.S. at 744  ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

In the March 29, 2018 denial of the first petition, Defendants noted that the LCA certified the position as a "wage level I" position, the lowest wage level certification. (Doc. 26-1 at 96.) Defendants said that this indicates the position was an "entry-level" position, or one that has "only a basic understanding of the occupation[, and] performs routine tasks that require limited, if any, exercise of judgment[.]" (Doc. 26-1 at 96.) The agency continued, "the LCA does not support your assertion that the proffered position is more complex or unique that [sic] only an individual with a bachelor's degree or higher in a specific specialty can perform them." (*Id.*)

In the second petition cycle, CARE included a letter from Myron Kramer, outside counsel for CARE. (Kramer Letter, Doc. 26-1 at 48–51.) In his letter, Mr. Kramer addressed the wage level designation issue, saying that USCIS' statement that a wage level I position is necessarily one for which an employer is seeking someone with "only a basic understanding of the occupation" is "not only incorrect legally, but is not supported by recent AAO caselaw." (Doc. 26-1 at 50; *see also* Mar. 29, 2018 Denial, Doc. 26-1 at 96.) Mr. Kramer then quotes an AAO case called *Matter of B-C-, Inc.*, which explains:

35

> A position's wage level designation is certainly relevant,
> but is not a substitute for a determination of whether a
> proffered position meets the requirements of Section
> 214 (i)(l) of the Act . . . There is no inherent
> inconsistency between an entry-level position and a
> specialty occupation. For some occupations, the 'basic
> understanding' that warrants a Level I wage may require
> years of study, duly recognized upon the attainment of a
> bachelor's degree in a specific specialty. Most
> professionals start their careers in what are deemed
> entry-level positions. That doesn't preclude us from
> identifying a specialty occupation.

(Doc. 26-1 at 50 (quoting *Matter of B-C-, Inc.* (Jan. 25, 2018 AAO) (non-

precedent), Doc. 26-1 at 166).) Mr. Kramer then goes on to explain that even

though the Impact Data Analyst position was certified as wage level I, the

Standard Occupational Classification page for Operations Research Analyst

classifies it as a "Job Zone 5," which means that "the **entry level position** of

Operations Research Analyst requires a minimum of up to four years of

experience." (Doc. 26-1 at 50 (emphasis in original); *see also* Summary Report,

"Operations Research Analysts," Doc. 26-1 at 218 (identifying Operations

Research Analysts as a Job Zone 5 position).)

O*NET[8] defines a "Job Zone" as "a group of occupations that are similar in:

how much education people need to do the work, how much related experience

people need to do the work, and how much on-the-job training people need to do

the work." O*NET OnLine Help, "Job Zones,"

https://www.onetonline.org/help/online/zones. There are five Job Zones,

---

[8]  As discussed in footnote 4, O*NET (Occupational Information Network) developed under the
sponsorship of the Department of Labor/Employment and Training Administration, is a
database that is built on the same and related data used in the OOH.

ranging from Job Zone 1, which are "occupations that need little or no preparation" to Job Zone 5, which are "occupations that need extensive preparation." *Id.* As noted by Mr. Kramer in both of his letters, Operations Research Analyst is categorized as a Job Zone 5. (*See* May 3, 2018 Kramer Letter, Doc. 26-1 at 50; June 21, 2018 Kramer Letter, Doc. 26-2 at 14; *see also* Summary Report, "Operations Research Analysts," Doc. 26-1 at 218.). The O*NET also notes that Operations Research Analysts are "SVP Range (8.0 and above)." (June 21, 2018 Kramer Letter, Doc. 26-2 at 14; Summary Report, "Operations Research Analysts," Doc. 26-1 at 218.) "SVP" here stands for "Specific Vocational Preparation," and is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." (June 21, 2018 Kramer Letter, Doc. 26-2 at 14–15.) SVP is measured by O*NET on a scale of 1 to 9, with 1 meaning a "short demonstration only" is enough specific training, and 9 meaning the position may require "over 10 years" of specific vocational training. O*NET Online Help, "Specific Vocational Preparation (SVP)," https://www.onetonline.org/help/online/svp.[9] As noted by O*NET, the training being referred to by this scale, "may be acquired in a school, work, military,

---

[9] The Court takes judicial notice of information that is publicly available on the O*NET website and not subject to reasonable dispute. Fed. R. Evid. 201 (b)(2) (court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.); *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010) (Finding that the district court properly took judicial notice of documents which were public records that were "not subject to reasonable dispute" because they were "capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned.")

institutional, or vocational environment. It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job." *Id.* Operations Research Analysts are categorized as SVP 8, which indicates that this position requires specific vocational training of "over 4 years up to and including 10 years." *Id.*

In the July 3, 2018 denial decision, the Defendants noted again that the Plaintiff listed the position as a "wage level I" position on the LCA. (Doc. 26-1 at 10.) The Defendants again characterized a wage level I position as an "entry-level position," or one that requires an employee has "only a basic understanding of the occupation[, and] performs routine tasks that require limited, if any, exercise of judgment[.]" (*Id.*) Accordingly, per the denial decision, "the LCA does not support your assertion that the proffered position is more complex or unique that [sic] only an individual with a bachelor's degree or higher in a specific specialty can perform them." (*Id.*) To this point, this part of the second denial is verbatim identical to the first, but then Defendants go on to say, "USCIS agrees that occupations such as physicians or architects – where employers have been able to establish that the positions normally require at least a bachelor's degree or higher or its equivalent in a specific specialty for entry – would be specialty occupations at entry level." (*Id.*) It is at this moment that Defendants reveal the fundamental flaw in their reasoning on this issue presented in this case. Defendants' position that the Impact Data Analyst position is unlike an architect or physician is undermined by the O*NET, which categorizes "Architects," "Physicians," and

"Operations Research Analysts" *all* as Job Zone 5.[10] Of particular interest –
considering the USCIS chose to use "Architect" as an exemplar – the O*NET
listing for "Architect" says "Education: Most of these occupations require a four-
year bachelor's degree, but some do not." Summary Report, "17-1011.00 –
Architects, Except Landscape and Naval," O*NET Online,
https://www.onetonline.org/link/summary/17-1011.00. The listing for
Operations Research Analysts says, "Education: Most of these occupations
require graduate school. For example, they may require a master's degree, and
some require a Ph.D., M.D., or J.D. (law degree)." Summary Report, "15-2031.00
– Operations Research Analysts," O*NET Online,
https://www.onetonline.org/link/summary/15-2031.00. This can only be read to
say that while both Architect and Operations Research Analyst positions usually
require at least a bachelor's degree, an Operations Research Analyst position
likely often may require even greater educational accomplishment than an
Architect position. This, combined with the evidence provided by Plaintiff –
particularly Dr. Goldsman's expert opinion and Dr. Chiu's letter – present
substantial evidence that the Impact Data Analyst position both required a
bachelor's degree or its equivalent as a minimum barrier to entry, and that it is so
complex or unique that it can only be performed by an individual with such a

---

[10] *Compare* Summary Report, "17-1011.00 – Architects, Except Landscape and Naval," O*NET Online, https://www.onetonline.org/link/summary/17-1011.00; *with* Summary Report, "29-1069.00 – Physicians and Surgeons, All Other," O*NET Online, https://www.onetonline.org/link/summary/29-1069.00; *and* Summary Report, "15-2031.00 – Operations Research Analysts," O*NET Online, https://www.onetonline.org/link/summary/15-2031.00.

degree and related training. Accordingly, Criteria 2 has been met, notwithstanding the fact that the position is a Wage Level I. USCIS' position to the contrary cannot be reasonably reconciled with the record or justified, due to its reliance on only a truncated portion of the relevant Labor Department occupational information data base.

### c.   Criterion 3: Employer normally requires a degree or its equivalent for the position.

CARE developed the new position of Impact Data Analyst to "carry out data analysis, visualization, and utilization and [to] provide administrative support to the Multiplying Impact/Impact Measurement Team (MI/IM) in [its] Programs, Partnership and Learning Department" when it offered the position to the Beneficiary. (Chiu Letter, Doc. 26-1 at 173.) As such, there was no prior example to look to in order to satisfy Criterion 3, which is what USCIS looks to as a basis for its decision. Furthermore, neither party argues that this criterion is present or relevant to the instant case. The Court therefore moves to the final criterion.

### d.   Criterion 4: The nature of the specific duties is so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree.

In determining whether a position satisfies Criterion 4, USCIS looks to the duties of the position and the overall operations of the organization. (July 3, 2018 Denial, Doc. 26-1 at 11.) Defendants contend that the position is not a specialty occupation because "it appears the beneficiary will perform the normal duties of

an Operations Research Analyst without any additional specialization or complexity that is usually associated with the attainment of a bachelor's degree or higher or its equivalent in a specific specialty." (*Id.*) USCIS discredits Dr. Goldsman's opinion that the duties of the job required a baccalaureate or higher degree in Engineering, Computer Science, Analytics, or Mathematics (Goldsman Letter, Doc. 26-1 at 61), because Dr. Goldsman based his conclusion on information obtained directly from the Plaintiff. (July 3, 2018 Denial, Doc. 26-1 at 11.) USCIS explained, "[t]here is no indication that the professor visited your business, observed your employees, interviewed them about the nature of their work, or documented the knowledge that they apply on the job." (*Id.*.) But this is simply not true. Dr. Goldsman's opinion once again plainly indicates that he conducted extensive interviews with both Dr. Chiu, the individual heading CARE's newly-established Multiplying Impact/Impact Measurement Team, and the beneficiary who had considerable expertise herself. (Goldsman Letter, Doc. 26-1 at 58.) In addition to conducting these interviews, Dr. Goldsman obtained a sample of some of the projects that the Impact Data Analyst would be required to undertake and review as well as CARE organizational documents so that he could assess the position duties as well as the background and educational requirements of the Impact Data Analyst position in light of these duties. (*Id.*) As the Impact Data Analyst position and function were new to CARE, there were no other employees beyond Dr. Chiu to interview or observe. And indeed, the

specific nature of the work of an Impact Data Analyst clearly does not lend itself to "observation".

Dr. Goldsman wrote in his second letter that in his extensive experience in the Operations Research field that "Operations Research is generally regarded as involving significantly more theoretical rigor and intellectual firepower" than Industrial Engineering, Operations Management, and Management Science. (June 20, 2018 Goldsman Letter, Doc. 26–2 at 19; *see also* Goldsman Resume, Doc. 26-1 at 101–57.) Dr. Chiu also wrote in her Position Description Letter that, "CARE has set the educational requirement of a Bachelor's degree in a relevant analytical field as its normal degree requirement for this position due to the complex nature of the duties of the job, and the increased reliance by CARE upon analytics in decision making during this highly critical time in our history. . ." (Chiu Letter, Doc. 26-1 at 171.) Dr. Chiu continued, explaining that, "in performing the duties of the position, it is important to have the [sic] familiarity with the types of data CARE collects, the formats of the data, and how they can be restructured to perform critical analyses" because of "the special nature of [CARE's] operations on a global basis" to "[eliminate] poverty through the development of sound, creative and novel programs maximizing a limited amount of resources." (*Id.* at 174.)

In the denial, the Defendants note that they "give[] less weight to the professor's opinion." (Doc. 26-1 at 11 (discussing Dr. Goldsman's letter).) The Defendants explain their decision to afford less weight to the opinion of Dr.

Goldsman by saying "where an opinion is not in accord with other information or is in any way questionable, USCIS is not required to accept or may give less weight to that evidence." (Doc. 26-1 at 12 (citing *Matter of Caron International*, 19 I&N Dec. 791, 1988 WL 235463 (Comm'r 1988).) Defendants conclude that they "discount[ed] the advisory opinion as not probative of any criterion of 8 CFR § 214.2(h)(4)(iii)(A)." (Doc. 26-1 at 12.)

This portion of the denial is troubling. The Defendants do not explain why they find Dr. Goldsman's letter to be "not in accord with other information" or in some other way "questionable" such that it should be discounted. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (noting that "the agency must examine the relevant data"); *RELX, Inc. v. Baran*, 397 F. Supp. 3d 41, 55 (D.D.C. 2019) ("The agency's decision was not based on a consideration of the relevant factors and was a clear error of judgment.") (internal quotation marks omitted); *Info Labs Inc., v. United States Citizenship and Immigration Services*, 2020 WL 1536251, at *3-6 (USCIS rejection of Plaintiff's specialty occupation H-1B petition for computer analyst position arbitrarily rejected when it discounted DOL's OOH's finding as inconclusive, despite the handbook's specification that bachelors degrees in computer or information science are common for computer analyst positions); *Fred 26 Importers, Inc. v. U.S. Dep't of Homeland Sec.*, 445 F. Supp. 2d 1174, 1180–81 (C.D. Cal. 2006) (Agency's conclusory finding that position did not meet specialized or complex criteria and its failure to address expert's opinion evidence

does not provide a basis for evaluation of Agency's decision, requiring summary judgment for plaintiffs); *The Button Depot, Inc. v. U.S. Dep't of Homeland Security,* 386 F. Supp. 2d 1140, 1148 (C.D. Cal. 2005) (the AAO abused its discretion when it did not indicate any basis for its conclusion that it "does not agree with the opinion evidence submitted by the petitioner."); *InspectionXpert Corp. v. Cuccinelli*, No. 1:19CV65, 2020 WL 1062821, at *27 (M.D.N.C. Mar. 5, 2020) (denial must demonstrate "a consideration of the relevant factors."); *and Hong Kong T.V. Video v. Ilchert,* 685 F. Supp. 712, 717 (N.D. Cal. 1988) (INS abused its discretion when it disregarded the only evidence provided by the petitioner).

Dr. Goldsman's letter is supportive and in accord with all of the other materials submitted by Plaintiff, especially as it pertains to the technical, theoretical, and interdisciplinary educational requirements for the CARE position and performance of the position duties. Indeed, Dr. Goldsman's opinion is not an outlier in any respect that is made clear by the Defendants, or by the other materials in the record. And his opinions are clearly grounded in his specific assessment of the CARE position within the context of its projected functioning in CARE's extensive international operation and his own breadth of academic operations analysis research and corporate and public sector consulting experience specifically in operations research. (S*ee* Goldsman Resume, Doc. 26-1 at 101–57.) What's more, the Defendants do not identify which other pieces of information they reviewed, nor how they weighed them, except to summarily

assert that Dr. Goldsman's opinion was based "largely on the job descriptions furnished by you." (July 3, 2018 Denial, Doc. 26-1 at 11.) Yet, as discussed earlier, the agency erroneously (and falsely) finds in this last section that there was no evidence that Dr. Goldsman interviewed any CARE employees regarding the nature of their work or the knowledge and skills that would be required for this position. Accordingly, Defendants' conclusion that Dr. Goldsman's letter is "not probative of any criterion" is plainly contradicted by the wording of the statutes and regulations and the content of the materials submitted by Plaintiff. (Doc. 26-1 at 11–12.) In sum, the basis of the agency's finding as to the fourth criterion is both not explained, and flatly contradicted by the record, and therefore, arbitrary and capricious.

## VI.   Concluding Analysis and Order

In determining whether the Defendants' decision was arbitrary and capricious, the Court has considered "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Fund for Animals*, 85 F.3d at 541–42 (quoting *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538–40 (11th Cir. 1990) (footnotes and citations omitted)). The Court performed a searching and careful review of the administrative record in considering whether the Defendants "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Black Warrior Riverkeeper*, 781 F.3d at 1288 (quoting *Motor Vehicle Mfrs. Ass'n of*

*U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Fund for Animals*, 85 F.3d at 541–42.

The Court in summary concludes:

(1) USCIS disregarded substantial evidence and failed to properly elucidate the basis of critical findings impacting its determination that Petitioner CARE failed to meet regulatory subclauses (1), (2), and (4) of 8 C.F.R. §214.2(h)(4)(iii)(A).

(2) USCIS legally erred in arbitrarily and capriciously making a summary per se finding that Petitioner could not meet the specialized educational qualification/degree regulatory requirement because CARE's Impact Data Analyst position qualifications could potentially be met by an applicant with a higher education degree in one *or more* several highly technical fields essential to impact data analysis. Indeed, the degree requirements and particularized standard for Operations Research Analysts is expressly recognized by the DOL OOH job description. The Agency's reading of the statute and regulations, in effect, arbitrarily removes the statutory and regulatory higher educational eligibility provisions for positions such as the one here that demand a bachelors or higher master's degrees focused on interrelated complex economic, demographic, and systems analysis. And some of Defendants' critical findings simply run contrary to the record evidence, without explanation.

The record evidence in the instant case demonstrates that the Impact Data Analyst position at CARE required, at a minimum, a bachelor's degree in one of a

small subset of closely-related fields that were correlated directly to the duties of the job. This requirement satisfies Criteria 1, 2 and 4 in 8 C.F.R. §214.2(h)(4)(iii)(A). The Defendants' stated reasons for denial of the petition on this point are plainly contradicted by the relevant statutes and regulations as well as the materials provided to them by Plaintiff.

It is also not apparent that Defendants considered all of the materials submitted to them, or how the Defendants weighed the various materials they reviewed. The denial also specifically failed to sufficiently explain the Defendants' reasoning behind deciding that the position did not require a "theoretical and practical application of a body of highly specialized knowledge" despite the substance of the CARE's application and letters from Dr. Chiu, Dr. Vandenberg, and Dr. Goldsman, among other things. *See* 8 U.S.C. § 1184(i)(1).

For the reasons discussed above, this Court finds that Plaintiff sufficiently demonstrated that it had met at least one of the requirements of 8 U.S.C. § 1184(i)(1). Specifically, Plaintiff demonstrated that the Impact Data Analyst position required attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation, in satisfaction of 8 U.S.C. § 1184(i)(1)(B). In its denial of the Petition, the Defendants did not sufficiently consider all of the relevant factors and evidence before it.  Nor did Defendants provide an adequate explanation as to how the Defendants reached some of their conclusions. The denial also failed to adequately elucidate the Defendants' reason for finding that the Impact Data

Analyst position did not require the theoretical and practical application of a body of highly specialized knowledge, the other requirement under 8 U.S.C. § 1184(i)(1).

The Plaintiff's Motion for Summary Judgment [Doc. 18] is therefore **GRANTED** in part and **DENIED** in part. The Motion is **GRANTED** insofar as Defendants' denial of Plaintiff's H-1B Petition is set aside. The Defendants' Motion for Summary Judgment [Doc. 21] is **DENIED**.  This matter is remanded to the USCIS for further proceedings, consistent with this Order and Opinion. Defendants are directed to reconsider their decision regarding the Plaintiff's H-1B visa application at issue in light of the findings herein and in light of the evidence of Record favorable to Plaintiff discussed here that the Agency either failed to address or summarily and arbitrarily rejected. The USCIS shall complete its review of Plaintiff's H-1B Petition within sixty days of the date of this Order, subject to the parties jointly agreeing on a different timeline.

      **IT IS SO ORDERED** this 18th day of May, 2020.


_____
**Amy Totenberg**
**United States District Judge**